Kira M. Rubel, WSBA #51691
**The Harbor Law Group**
3615 Harborview Drive NW, Suite C
Gig Harbor, WA 98332-2129
Telephone.  (253) 251-2955

**KALIEL PLLC**
Jeffrey Kaliel, Esq.* (DC Bar No. 983578)
Sophia Gold, Esq.* (CA Bar No. 307971)
1875 Connecticut Ave. NW, 10th Floor
Washington, D.C. 20009
Telephone: (202) 270-4783
*Pro hac vice forthcoming*

**EDELSBERG LAW, PA**
Scott Edelsberg, Esq.* (FL Bar No.100537
CA Bar No. 330990)
Aaron Ahlzadeh, Esq.* (FL Bar No. 0111329)
20900 NE 30th Ave #417
Aventura, FL 33180
Telephone: 305-975-3320
*Pro hac vice forthcoming*

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.* (FL Bar No. 101754)
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Telephone: 305-479-2299
*Pro hac vice forthcoming*

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DOUGLAS TURNIDGE and JAMES HOUSEGO, on behalf of themselves and all others similarly situated, | Case No: _____ |
| Plaintiffs, | Judge: _____ |
| vs. | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| GLACIER BANK d/b/a MOUNTAIN WEST BANK, | |
| Defendant. | |

COMPLAINT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CLASS ACTION COMPLAINT

Plaintiffs Douglas Turnidge and James Housego bring this lawsuit on behalf of themselves and all others similarly situated and allege the following based on personal knowledge as to allegations regarding Plaintiffs and on information and belief as to all other allegations.

## INTRODUCTION

1.      Plaintiffs bring this action against Defendant Glacier Bank d/b/a Mountain West Bank (the "Bank," "Glacier," or "Glacier Bank") on behalf of themselves all other similarly situated accountholders, arising from the Bank's routine practice of charging its customers: (a) overdraft fees ("OD Fees") on transactions that did not overdraw their account; and (b) out-of-network ATM Fees ("OON Fees"), despite Glacier not disclosing these fees in its Fee Schedule and account documents, as required.

2.      As explained below, Defendant's practices breach the contractual promises contained in the account documents; violate the covenant of good faith and fair dealing; and/or result in the Bank being unjustly enriched.

3.      Glacier's customers, including Plaintiffs, have been injured by Glacier's deceptive and outright fraudulent practices to the tune of millions of dollars bilked from their accounts; all of which is done in violation of the agreements between Glacier and its customers.

4.      Plaintiffs seek damages, restitution, and injunctive relief, on behalf of themselves and all others similarly situated, as a result of Defendant's unlawful conduct, as described in greater detail below.

## PARTIES

5.    Douglas Turnidge is a resident of Spokane Valley, Washington, and holds a Glacier Bank checking account.

6.    James Housego is a resident of Coeur d'Alene, Idaho, and holds a Glacier Bank checking account.

7.    Glacier is a Montana bank engaged in the business of providing retail banking services to consumers, like Plaintiffs and members of the putative Classes, through its retail bank branches in Washington, Idaho, Arizona, Utah, Wyoming, Colorado, and Nevada, as well as its branches doing business under the name "Mountain West Bank." Defendant's headquarters are located in Kalispell, Montana. It has more than $13 billion in assets.

## JURISDICTION AND VENUE

8.    Defendant regularly and systematically provides retail banking services throughout the State of Washington, including the county in which this Court is located, and offers retail banking services to customers in this State, including members of the putative Class.  As such, it is subject to the personal jurisdiction of this Court.

9.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005 ("CAFA").  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Defendant.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction in this District and regularly conducts business in this District, and

because one or more of the named Plaintiffs and/or putative class members were assessed fees in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I. GLACIER CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

#### A. Overview of Claim

11.    Plaintiff Turnidge brings this cause of action, on behalf of himself and all others similarly situated, challenging Glacier's practice of charging overdraft fees ("OD Fees") on what are referred to in this Complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

12.    Here's how it works.  At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Glacier immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount.  In short, customers' accounts will always have sufficient available funds to cover these transactions because Glacier has already sequestered the funds for payment.

13.    As explained below, Glacier still assesses a crippling $30 overdraft fee for many of these transactions and mispresents its practices in its account documents.

14.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Glacier assess a crippling $30 overdraft fee for many of those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

15.    Glacier maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for

debit card transactions at the precise instance they are made.  When a customer makes a purchase with a debit card, Glacier sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. These funds are not available for any other use by the accountholder and are specifically tied to the corresponding debit card transaction.

16.    When any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions.  What this means is that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

17.    Still, despite keeping those sequestered funds off-limits to other transactions, Glacier improperly charges its customers OD Fees on those APPSN Transactions, although the APPSN Transactions, as explained above, will ***always*** have sufficient available funds to be covered.

18.    Indeed, the Consumer Financial Protection Bureau has expressed concern with this very issue, calling such practices "unfair," deceptive," and "misleading" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above.  Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged.  Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions.  Examiners noted that these disclosures created a

misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

19.     This deceptive practice is not universal in the banking industry. Indeed, major banks like Wells Fargo—one of the largest consumer banks in the country—does not charge OD Fees on APPSN transactions.

20.     There is no justification for Defendant's practices, other than to maximize Glacier's revenue and boost profits. APPSN Transactions only exist because intervening checking account transactions supposedly reduce a customer's available account balance. Glacier is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it has chosen the latter to the tune of millions of dollars bilked unlawfully bilked from its customers each year. Yet Glacier was not satisfied with collecting millions in OD Fees. Instead, it sought millions *more* by applying its overdraft policy (which is not disclosed to its customers) in such a way that it specifically targets APPSN Transactions, among other types of transactions.

21.     Besides being deceptive, unfair, and unconscionable, Defendant's practices breach the express promises contained in their customers' adhesion contracts—agreements which also misrepresent and deceive reasonable consumers about the true nature of Glacier's overdraft fee

processing logic and practices. These unfair practices are also used by Defendant to exploit the contractual discretion afforded to it.

22.     In plain, clear, and simple language, the checking account contract documents relating to OD Fees promise that Glacier will only charge OD Fees for transactions in situations where the customer's account has insufficient funds to cover the transaction.

23.     In short, Glacier is not authorized under the account documents to charge OD Fees for transactions that have not overdrawn an account. Yet, it has repeatedly done so and will continue to do so unless the practice is halted by this Court.

**B.  Mechanics of a Debit Card Transaction**

24.     A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from Glacier.  When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to Glacier, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

25.     At this step, if the transaction is approved, Glacier immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

26.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which

COMPLAINT 7

may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, *Unfair or Deceptive Acts or Practices*, 74 FR 5498-01 (Jan. 25, 2009).

27.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

28.    Glacier (like all banks) decides whether to "pay" debit card transactions at the time of authorization. After that, Glacier is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when Glacier may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

29.    When the transaction is ultimately settled, there is no change—no impact whatsoever—to the amount of available funds in a customer's account.

C. **Glacier's Account Contract**

30.    Plaintiffs' checking accounts with Glacier Bank are governed by Glacier's standardized Deposit Agreement, titled "Terms and Conditions of Your Account" ("Deposit Agreement"), attached hereto as **Exhibit A**. It states that Glacier will not charge OD Fees on transactions that have sufficient funds to cover them at the time they are initiated.

31.     Under the Deposit Agreement, Glacier promises to immediately place holds on account funds for debit card transactions, and that those holds endure until the transaction is settled, which can cause other transactions to have insufficient funds:

> **A temporary debit authorization hold affects your account balance** – On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money when the merchant does not know the exact amount of the purchase at the time the card is authorized.  The amount of the temporary hold may be more than the actual amount of your purchase…This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it could be three calendar days, or even longer in some cases, before the adjustment is made.  Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold.  If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction is we do not pay it or an overdraft transaction if we do pay it…

Deposit Agreement (Ex. A) at 2.

32.     The Deposit Agreement also specifies that Glacier determines overdrafts when it decides to "honor" transactions:

> **Overdrafts**—You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. …

*Id.*

33.     For debit card transactions, the bank decides whether to "honor" a debit card transaction at the moment of authorization.

34.     For APPSN Transactions, which are immediately deducted from a positive account balance and sequestered for payment of that same transaction, there are *always* funds to cover those transactions—yet Glacier assesses OD Fees on them anyway.

35.     Glacier-owned banks also provide an Overdraft Disclosure that contains additional promises:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways: •

We have standard overdraft practices that come with your account. • We also offer overdraft protection plans, such as a link to a savings account, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans. What are the standard overdraft practices that come with my account? We do authorize and pay overdrafts for the following types of transaction: • Checks and other transactions using your checking account number • Automatic bill payment • Recurring debit card transactions We do not authorize and pay overdrafts for the following types of transactions unless you ask us to: • ATM Transactions • Everyday debit card transactions We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined.

36.    The above promises indicate that transactions are only treated as overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN transactions.

37.    In fact, Glacier actually authorizes transactions on positive funds, sequesters those funds as off-limits to any subsequent transaction, and then fails to use those same funds to settle the corresponding transaction for which they were initially sequestered in the first place.

38.    Glacier charges OD Fees even when sufficient funds exist to cover transactions that are "honored" into a positive balance. No express language in any document states that Glacier may impose OD Fees on any APPSN Transactions.

39.    Glacier's account documents misconstrue and mislead consumers about Glacier's true debit card policies and overdraft fee processing logic.

40.    First, and most fundamentally, Glacier charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions.

41.    Glacier's practice of charging OD Fees even when sufficient funds exist to cover the transaction violates its contractual promise not to do so. This discrepancy between Glacier's actual practices and those described in its account documents causes consumers, like Plaintiffs, to incur more OD Fees than they should.

COMPLAINT 10

42.     Next, sufficient funds for APPSN Transactions are actually debited and held from the account immediately, consistent with standard industry practice.

43.     At the time of settlement, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, Glacier cannot then charge an OD fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

44.     This discrepancy between Glacier's actual practices and the contract causes accountholders to incur more OD Fees than they should.

45.     In sum, there is a huge contradiction between the practices described in Glacier's account documents and Glacier's actual practices.

**D.  Plaintiff Turnidge's Debit Card Transactions**

46.     By way of example only, on May 1, 2019, July 1, 2019, and July 31, 2019, among other dates, Plaintiff Turnidge was assessed OD Fees in the amount of $30.00 each for debit card transactions that settled on those days.  However, those transactions were authorized into a positive account balance prior to that day.  Further, at that time of authorization, positive funds were immediately debited from Plaintiff Turnidge's account for the debit card transactions on which he was later assessed OD Fees.

**II.     GLACIER CHARGES UNDISCLOSED OUT OF NETWORK ATM FEES**

47.     Glacier issues debit cards to its checking account customers, including Plaintiffs, which allow its customers to have electronic access to their checking accounts for purchases, payments, and ATM withdrawals at both Glacier and non-Glacier ATMs.

48.     When consumers use an ATM not owned by their home bank, they are often assessed a fee by the ATM operator. Some (but by no means all) banks then tack on their own out-

of-network fee ("OON Fees"), for using someone else's ATM, on top of the fee charged by the AT owner, the latter which now averages more than $3 nationwide.

49.    Glacier assesses a $2.00 OON Fee for out-of-network ATM transactions, in addition to the fee assessed by the ATM owner. But unlike other banks that charge such a fee, Glacier does not tell its accountholders this.

50.    Pursuant to Glacier's Deposit Agreement (Ex. A):

> AGREEMENT - This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. **You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document.**

Deposit Agreement at 1 (emphasis added).

51.    Importantly, Glacier's Fee Schedule, attached hereto as **Exhibit B,** does describe any out-of-network ATM fees whatsoever.

52.    For perspective, it is helpful to consider how other leading Banks in the U.S. disclose their OON Fees.  For example, Bank of America—consistent with the vast majority of banks in this state and the country—discloses as follows in its standard account agreement:

> Non-Bank of America ATM Fee for:  Withdrawals, transfers, and balance inquiries at a non-Bank of America ATM in the U.S. $2.50 each.
>
> When you use a non-Bank of America ATM, you may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer.

53.    In short, when Glacier's customers use a non-Glacier ATM, the fees add up very quickly—and to the surprise of consumers like Plaintiffs.

54.     Here, Glacier does not adequately inform its account holders that they will be charged two separate fees for each non-Glacier ATM withdrawal, and never once tells consumers the total amount of that double-fee.

55.     Neither Glacier nor the ATM owner informs the accountholder of the total charge for a single ATM withdrawal.  Indeed, at the moment a consumer withdraws funds from a non-Glacier ATM, that ATM will display a screen prompt asking the consumer to accept the ATM owner's fee before proceeding with the withdrawal.  But that fee does not include the additional fees assessed by the consumer's own bank.  And Glacier's account disclosures do not clearly explain the total charge that an accountholder will incur for out-of-network ATM usage, or even that the Glacier will, as a matter of course, always charge its own OON Fees, in addition to those charged by the ATM owner.

56.     The Bank's failure to plainly advise its customers about the total fee amount they will incur for a non-Glacier ATM withdrawal is intentional.  The Bank knows full well that consumers would not knowingly pay $4 or $5 for a simple withdrawal.

57.     Plaintiffs' experience is illustrative.

58.     By way of example only, on April 15, 2019, August 26, 2019, September 23, 2019, and December 6, 2019, among other dates, Plaintiff Turnidge was assessed a $2.00 out-of-network ATM fee, in addition to the fee charged by the out of network ATM owner.

59.     Similarly, and by way of example only, on August 20, 2019, August 22, 2019, August 23, 2019, August 26, 2019, August 27, 2019, September 10, 2019, and September 16, 2019, among other dates, Plaintiff Housego was assessed a $2.00 out-of-network ATM fee, in addition to the fee charged by the out of network ATM owner

60.     Glacier's assessment of OON Fees violates its contract with its accountholders.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The Classes include:

> All Glacier accountholders in Washington, Idaho, Arizona, Utah, Wyoming, Colorado, and Nevada who, within the applicable statute of limitations period, were charged an OD Fee on a debit card transaction that did not overdraw the account (the "OD Fee Class").

> All Glacier accountholders in Washington, Idaho, Arizona, Utah, Wyoming, Colorado, and Nevada who, within the applicable statute of limitations period, were charged an OON Fee (the "OON Fee Class").

62.     Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors, and the members of their immediate families, and any entity in which Defendant has a controlling interest, as well as the legal representatives, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

63.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes and/or to add subclasses, if necessary, before this Court makes a final determination as to whether class certification is appropriate.

64.     The questions raised by this lawsuit are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes.  These questions predominate over questions that may affect only individual Class members because Glacier has acted on grounds generally applicable to all class members. The common legal or factual questions include, but are not limited to:

a)  Whether Glacier improperly charged OON or OD Fees;

b) Whether any of the conduct enumerated above violates the contract;

c) Whether any of the conduct enumerated above violates the covenant of good faith and fair dealing;

d) Whether any of the conduct enumerated above constitutes unjust enrichment; and

e) The appropriate measure of damages.

65.     The affected parties are so numerous that joinder is impracticable.     Upon information and belief, and subject to class discovery, the Classes consist of thousands of individuals, the identities of whom are within the exclusive knowledge of Glacier and can be ascertained only by resort to Glacier's records.  Glacier has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiffs.

66.     It is impracticable to separately bring the class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, expense, or risking the possibility of inconsistent or contradictory judgments or verdicts that numerous individual actions would likely engender. The benefits of class treatment, including providing injured persons with a cohesive method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any perceived difficulties that may arise in the management of this class action.

67.     Plaintiffs' claims are typical of the claims of the other class members in that they arise out of the same wrongful business practices by Glacier, as described herein.

68.     Plaintiffs are adequate class representatives in that they both have a Glacier checking account and have suffered damages as a result of Glacier's breaches of contract,

COMPLAINT 15

violations of the covenant of good faith and fair dealing, and unjust enrichment scheme. In addition:

a) Plaintiffs are committed to vigorously prosecuting this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in litigating class actions and, in particular, class actions on behalf of consumers against financial institutions;

b) There is no conflict of interest between Plaintiffs and the unnamed members of the Classes;

c) Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d) Plaintiffs' counsel has the resources and the expertise to confront the substantial costs and complex legal issues associated with this type of litigation.

69.     Plaintiffs know of no difficulty that will be encountered in the maintenance of this action that would preclude its treatment as a class action.

70.     Glacier has acted or refused to act on grounds generally applicable to all of the class members, thereby making it appropriate for the Court to enter final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

71.     All conditions precedent to bringing this action have been satisfied and/or have been waived by Defendant.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
**(On Behalf of Plaintiffs, the OD Fee Class, and the OON Fee Class)**

72.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

73.     Plaintiffs and Glacier contracted for checking account services, as memorialized in the Deposit Agreement, Fee Schedule, and Overdraft Disclosure.

74.     Defendant mischaracterized in the Account Documents its true practices concerning OON Fees and OD Fees, and breached the express terms of the Account Documents.

75.     No contract provision authorizes Defendant to charge OD Fees for transactions that did not overdraw the customer's account, or to assess OON Fees.

76.     Defendant has breached its contracts with Plaintiffs and the class members through its overdraft policies and practices as alleged herein.

77.     Plaintiffs and the class members have performed all of the obligations on them pursuant to the Bank's agreements.

78.     Plaintiffs and the class members have sustained monetary damages as a result of each of Defendant's breaches.

## COUNT II
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiffs, the OD Fee Class, and the OON Fee Class)

79.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

80.     Plaintiffs and Glacier contracted for checking account services, as embodied in the Deposit Agreement, Overdraft Disclosure, and Fee Schedule.

81.     Washington law mandates that an implied covenant of good faith and fair dealing govern every contract.  The covenant of good faith and fair dealing prohibits Defendant's discretion to abuse self-granted contractual powers.

82.    This good faith requirement extends to the manner in which a party, such as Defendant, wields the discretion conferred on it via contract.

83.    Good faith and fair dealing, in connection with executing contracts and discharging, in good-faith, the duties and obligation set forth in the contract, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to interpret, disclose, or specify certain material contractual terms are examples of bad faith in the performance of contracts.

84.    Subterfuge and evasion also violate the obligation of good faith in performance of a contract, even when the actor believes its conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

85.    Glacier breached the covenant of good faith and fair dealing through its overdraft fee and out-of-network ATM fee policies and practices as explained herein.

86.    Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

87.    Defendant's conduct constitutes fraud and/or malice as defined by Washington law for purposes of the imposition of punitive damages.

88.    Plaintiffs and the class members have performed all of the obligations imposed on them under the Deposit Agreement.

89.     Plaintiffs and the class members have sustained monetary damages as a result of each of Defendant's breaches of the covenant of good faith and fair dealing.

## COUNT III
## UNJUST ENRICHMENT
**(On Behalf of Plaintiffs, the OD Fee Class, and the OON Fee Class)**
***(Pled in the Alternative to Count I and Count II)***

90.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

91.     This Count is brought in the alternative to Plaintiffs' claims for breach of contract and breach of the covenant of good faith and fair dealing. Plaintiffs acknowledge that their breach of contract claim cannot be tried in tandem with their unjust enrichment claim.

92.     To the detriment of Plaintiffs and the Classes, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct, as alleged herein.

93.     Plaintiffs and the class members conferred a benefit on Defendant when they paid Defendant OON Fees and OD Fees that were not sufficiently disclosed or authorized in the governing Account Documents.

94.     Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits from Plaintiffs and the class members, which, under the circumstances, would be unjust to allow Defendant to retain.

95.     Defendant's unjust enrichment is traceable to and resulted directly and proximately from the conduct alleged herein.

COMPLAINT 19

96.     Accordingly, Plaintiffs and the class members seek disgorgement from Defendant of all OD Fees and OON Fees that were wrongfully obtained from its customers in connection with, or as a result of, its inequitable conduct, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray that the Court enter judgement in favor of Plaintiffs and the class members, and grant them relief in the form of:

A.     Certifying the proposed Classes pursuant to Montana Rule of Civil Procedure 23, appointing the Plaintiffs as representative of the Classes, and appointing counsel for Plaintiffs as lead counsel for the Classes;

B.     Declaring that Defendant's policies and practices as described herein constitute a breach of contract and a breach of the covenant of good faith and fair dealing or unjust enrichment;

C.     Enjoining Defendant from the wrongful conduct as described herein;

D.     Awarding restitution of all fees at issue paid to Defendant by Plaintiffs and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.     Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

F.     Awarding actual and/or compensatory damages in an amount according to proof;

G.     Awarding pre-judgment interest at the maximum rate permitted by applicable law;

H.     Reimbursing all costs, expenses, and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

COMPLAINT 20

I.      Awarding such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues so triable as a matter of right.

DATED: August 24, 2020

Respectfully submitted by:

*/s/ Kira M. Rubel*
Kira M. Rubel, WSBA #51691
**The Harbor Law Group**
3615 Harborview Drive NW, Suite C
Gig Harbor, WA 98332-2129
Telephone.  (253) 251-2955
Email: Kira@theharborlawgroup.com

**KALIEL PLLC**
Jeffrey Kaliel, Esq.* (DC Bar No. 983578)
jkaliel@kalielpllc.com
Sophia Gold, Esq.* (CA Bar No. 307971)
sgold@kalielpllc.com
1875 Connecticut Ave. NW, 10th Floor
Washington, D.C. 20009
Telephone: (202) 270-4783
*Pro hac vice forthcoming*

**EDELSBERG LAW, PA**
Scott Edelsberg, Esq.* (FL Bar No.100537
CA Bar No. 330990)
scott@edelsberglaw.com
Aaron Ahlzadeh, Esq.* (FL Bar No. 0111329)
aaron@edelsberglaw.com
20900 NE 30th Ave #417
Aventura, FL 33180
Telephone: 305-975-3320
*Pro hac vice forthcoming*

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.* (FL Bar No. 101754)
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Telephone: 305-479-2299
*Pro hac vice forthcoming*

*Counsel for Plaintiffs and the Proposed Class*

COMPLAINT 22